UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

MILTON JACOBS,

    Plaintiff,

v.                                                                  2:12cv508

MICHAEL J. ASTRUE,
Commissioner of Social Security Administration,

    Defendant.

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff Milton Jacobs seeks judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying his claim for disability insurance under Title II of the Social Security Act. 42 U.S.C. §§ 401-434. He alleges several errors, including a claim that the administrate law judge ("ALJ") improperly weighed a Department of Veterans Affairs' ("VA") finding that he was disabled. This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B).

After reviewing the entire record, the undersigned finds that the Fourth Circuit's decision in Bird v. Commissioner of Social Security, 699 F.3d 337 (4th Cir. 2012) mandates remand to permit the ALJ to re-evaluate Jacobs' VA disability rating. Accordingly, this report recommends that the final decision of the Commissioner be vacated and the matter remanded for further review.

1

# I. PROCEDURAL BACKGROUND

On July 15, 2009, Jacobs filed an application for disability insurance benefits ("DIB"), alleging disability beginning December 27, 2006, due to migraine headaches, left and right bilateral knee pain, lower back pain, hypertension, and pain in his feet. (R. 61, 104-05). The Commissioner denied his application initially (R. 82-84), and upon reconsideration. (R. 89-91). Jacobs requested an administrative hearing (R. 94-96), which was conducted on May 17, 2011. (R. 38).

Administrative Law Judge ("ALJ") William T. Vest, Jr. concluded that Jacobs was not disabled within the meaning of the Social Security Act and denied his claim for DIB. (R. 11-22). The Appeals Council denied review of the ALJ's decision (R. 1-5), thereby making the ALJ's decision the final decision of the Commissioner. Pursuant to 42 U.S.C. § 405(g), on September 13, 2012, Jacobs filed this action seeking judicial review of the Commissioner's final decision. (ECF No. 1). This case is now before the Court to resolve the parties' cross-motions for summary judgment. (ECF Nos. 9, 11).

# II. FACTUAL BACKGROUND

Jacobs, a veteran, was born on September 4, 1965 (R. 104), and has a degree in journalism with an emphasis in photojournalism. (R. 41, 43-44). He testified that he is 5'6" and weighs 268 pounds. (R. 43). He was previously employed as a manager at financial institutions, part-time photographer, booking agent, and supply technician in the military. (R. 41-43). Jacobs was active duty in the military from May 1986 to December 1989, and then served in the reserves until June 1994. (R. 42). In 1987, while at basic training in Germany, Jacobs developed pain in both his legs and knees. He was diagnosed with bilateral stress fractures of the tibia and a

right patella injury. (R. 200-01).

In 2006, Jacobs began having difficulty performing his work. He testified that he was employed as the branch manager of Dollar Financial Group until December 27, 2006 when he left. (R. 41). He stated he left this job because it required too much standing, and he was too stressed. (R. 55). Jacobs alleges he cannot work due to the following impairments: migraine headaches, bilateral knee pain, lower back pain, hypertension, and pain in the feet. (R. 42, 61). He testified that these impairments create pain in his legs which makes it difficult for him to stand, walk, or bend (R. 45-47, 50-54).

All of Jacobs treatment has occurred at the VA Medical Center in Hampton ("VAMC"). In September 2006, Dr. Kay S. Reid performed a Compensation and Pension Examination on Jacobs to determine if he had any disabilities and, if so, to what extent they were service-connected. (R. 200-223). The exam revealed that Jacobs had bilateral leg and knee pain, but he had a normal gait. (R. 201). Dr. Reid determined that he could only stand for fifteen to thirty minutes at a time and could only walk .25 to one mile before needing to rest. Id. Jacobs' symptoms indicated degenerative joint disease, but there was no evidence of joint effusion. (R. 203). In his left knee there was moderate, and in his right knee severe, narrowing of the medial femorotibial and femoropatellar joint spaces, id., but he was negative for Osgood-Schlatters and there was no mass, grinding, instability or patellar abnormality. (R. 216-17). Jacobs was diagnosed with residual pain in the tibia from stress fractures. (R. 205). Dr. Reid determined that his bilateral leg condition had significant effects on his occupational activities, because it decreased his mobility and created problems with lifting and carrying. Id. However, the condition created only mild effects on chores, shopping, exercise and recreation and traveling.

Id.

Dr. Reid also examined Jacobs for hypertension and migraines. Jacobs' hypertension had progressively worsened since its onset in 1988, but he had no serious diseases related to hypertension. (R. 206). Though he had a regular heart rhythm with no abnormalities, Dr. Reid found that he continuously needed medication to control his hypertension. (R. 206-07). Jacobs reported that he suffered migraine headaches about once every two months (R. 218), however, Dr. Reid found that the migraines were not prostrating and that ordinary activity was possible. Id.

Dr. Reid concluded from the exam that Jacobs' degenerative joint disease and hypertension were related to his military service, while his migraine headaches were not. (R. 220-23). At some point, the VA determined Jacobs 60% disabled[1] but compensated him at the 100% rate, because the VA concluded he was "totally and permanently disabled due to [his] service-connected disabilities," and thus unemployable. (R. 384). According to the VA, Jacobs' disabling impairments included bilateral lower leg conditions, migraine headaches, and hypertensive vascular disease. (R. 386).

Jacobs primarily treated with Dr. Richard T. Deaton at the VAMC. In February 2008 he visited Dr. Deaton for treatment of migraine headaches. (R. 348). Dr. Deaton suggested he consult with a neurologist, which Jacobs did in March 2008. (R. 333-47).

Jacobs informed Dr. Kenneth W. Waller that his migraine headaches began in 1986. (R. 333). He stated they had become more severe and occur roughly one to two times per month, but none had occurred since he started Divalproex three weeks prior. Id. Jacobs' medical history

---

[1] The Record is not clear as to when the VA awarded Jacobs disability. Dr. Reid's Compensation and Pension Examination was conducted in September 2006, but a document attached to a benefits summary letter later in the Record suggests that award date was possibly as early as March 2002. (R. 386). What is clear is that Jacobs was determined disabled by at least December 1, 2008. (R. 384).

revealed an October 2007 CT scan which was unremarkable. (R. 336). Jacobs also reported his pain level as a two. (R. 346). Dr. Waller noted that Jacobs was negative for indirect straight leg raising and found no abnormalities with his cranial nerves, motor skills, or cerebellar functioning. (R. 342-43). He concluded Jacobs suffered from migraine headaches, sleep apnea, obesity, and hypertension. (R. 344). He directed Jacobs to continue his medications and undergo an EEG and polysomnogram. Id.

Jacobs next treated with Dr. Deaton in July 2008 and complained of hypertension. (R. 317-19). A review revealed Jacobs had no headaches, nor any other physical concerns. (R. 318). Dr. Deaton found that Jacobs' hypertension and hyperlipidemia were controlled and recommended he continue the same diet and medications. (R. 318-19).

In October 2008 Jacobs visited VAMC for outpatient screening concerning a neurology issue. (R. 312). He appeared alert and reported no pain. (R. 313). In November 2008 he had his follow-up appointment with Dr. Waller concerning his migraine headaches and obstructive sleep apnea. (R. 297). Jacobs reported his migraines had decreased in frequency and severity since his March 2008 appointment and stated he had no pain. (R. 298). Dr. Waller noted that Jacobs' migraines improved with Divalproex and that his hypertension was well-controlled with his current medications. (R. 308). Jacobs' hypertension and hyperlipidemia remained well-controlled and he again reported no pain at his next regular check-up with Dr. Deaton in February 2009. (R. 291). The records reveal that Jacobs was taking several medications to control these conditions. (R. 290).

In July 2009 Dr. Deaton signed a DMV Certificate of Disability affirming that Jacobs was disabled. (R. 103). He indicated that Jacobs suffered from degenerative joint disease and as a

result could not walk 200 feet without stopping to rest, nor walk without the use of some assistive device. Id. In August, Jacobs visited Dr. Deaton for routine health maintenance. (R. 281-84). He reported a pain level three due to arthralgia[2] and appeared well with no other apparent issues other than obesity. (R. 281). Dr. Deaton noted that while Jacobs' hypertension remained well-controlled, his hyperlipidemia was not yet controlled. (R. 282). He therefore increased Jacobs' daily Fenofibrate dosage and continued him on Pravastatin. Id.

At a weight management consultation in September 2009, Jacobs reported high blood pressure, arthritis, back pain due to spinal disc disease and osteoporosis. (R. 271). He also reported that his current health was good but that back problems were a barrier to increased physical activity. (R. 272). He set goals to attend weight reduction classes, slow down his eating, increase his exercise and complete a daily fifteen minute walk. (R. 275-76).

On February 17, 2010, Dr. Peter Birk, a physician retained by the Agency, examined Jacobs. (R. 355-58). Jacobs reported that due to degenerative arthritis of his knees he could not work, stoop or bend and could only walk 100 yards before resting. (R. 355). Jacobs' blood pressue was 120/62, and Dr. Birk found no issues with his peripheral joints. (R. 356). While Jacobs wore a knee brace and had some difficulty bending his right knee, he was negative for a Baker's cyst and had only slightly reduced range of motion. (R. 357). Dr. Birk further noted that Jacobs used no walking stick or other assistive device and had a normal gait. Id. He found no evidence of hypertensive impairment or motor function disorganization. Id. Dr. Birk concluded that Jacobs had osteoarthritis of the knees and was unsure as to any other medical problems. Id.

A week later Dr. Richard Surrusco, a state agency physician, reviewed Jacobs' records at

---

[2] Because Jacobs' pain level was not a 4 or higher, the VAMC did not conduct a further pain assessment.

the application level and completed a Physical Residual Functional Capacity Assessment. (R. 65-66). Dr. Surrusco opined that Jacobs was capable of performing work which required him to lift and/or carry no more than twenty pounds occasionally and ten pounds frequently; stand and/or walk four hours and sit about six hours each in an eight-hour workday; with no climbing and limitations on pushing or pulling, but allowing for other postural activities occasionally. Id. He noted that the exertional limitations were due to Jacobs' bilateral knee arthritis and obesity, but found Jacobs' statements concerning the severity of the limiting effects unsupported by objective medical evidence. (R. 64-65).

Jacobs continued treatment with Dr. Deaton at the VAMC in March 2010 complaining of knee pain, low back pain and migraine headaches, though he noted the migraines had become less severe and incapacitating. (R. 363). Dr. Deaton found that straight leg raising caused Jacobs lumbosacral pain at forty-five degrees but no pain was associated with the Figure 4 maneuver. (R. 364-65). Dr. Deaton also noted tenderness between the L4 and L5 vertebrae, on the medial aspect of the right patella, and near the left patella. Id. Jacobs reported a pain level four for both intensity and frequency. (R. 367-68). Jacobs stated the pain resided in his head, face, and lower limbs and interfered with his daily functioning. (R. 368). Dr. Deaton concluded that Jacobs' impairments included bilateral degenerative joint disease of the knees and chronic lumbosacral pain. (R. 365). He requested a plain film of both knees and lumbosacral spine, an orthopaedic consultation for Jacobs' knees, and a MRI of the lumbosacral spine. Id.

Film of Jacobs' knees revealed minor degenerative changes since 2006 with no definitive joint space narrowing. (R. 362). The knees aligned within the normal limits and there were no acute findings. Id. The film of the lumbosacral spine revealed sacralization of the L5 vertebra

which had a spina bifida occulta, but the alignment of the vertebrae appeared normal otherwise. (R. 361). There were no fractures, disc spaces were well-maintained, pedicles intact and paravertebral soft-tissues were unremarkable. Id. The MRI of the lumbar spine revealed no significant spinal or foraminal stenosis. (R. 360). Jacobs also had a CT scan of his head which revealed no significant abnormality. (R. 359).

After these tests were concluded Dr. Robert Castle, a state agency physician, reviewed Jacobs' records at the reconsideration level and completed a Physical Residual Functional Capacity Assessment. (R. 76-77). Dr. Castle's findings were identical to Dr. Surrusco's prior findings. Id.

Jacobs continued treatment with Dr. Deaton, complaining of hypertension in September 2010. (R. 417). Jacobs' blood pressure was controlled at 125/82 and though he still had bilateral tenderness in his knees, there was no swelling or redness. (R. 417, 420). Dr. Deaton concluded that the hypertension was well-controlled but the bilateral knee arthralgia persisted. (R. 420). Jacobs also reported a pain level five, with "aching" pain in his head, lower back and lower limbs. (R. 424-25). Dr. Deaton suggested he see a pain specialist. (R. 424).

On October 18, 2010, Jacobs was evaluated for chronic lower back pain by Drs. Antown Morton and Mikiso Mizuki, Jr.. (R. 412-16). Jacobs reported that his back pain starts after standing or sitting for a long time and occasionally produces a tingling sensation that travels down to his right leg. (R. 413). He also reported a general pain level of three, which he stated was bearable, with the worst pain at level ten. Id. He stated that walking or sitting for a long time worsens the pain, while bending forward improves the pain. Id. Jacobs tested negative on the Romberg Test and had a stable and smooth gait. (R. 415). His range of motion decreased in his

legs when he extended to 45 degrees from the supine position, but his strength in all categories was 5/5 and his reflexes tested positive. Id. Drs. Morton and Mizuki, Jr. concluded that Jacobs' pain impairments included chronic lower back pain without radiculopathy, sleep disturbance, migraines, and obesity. (R. 416). They started him on Tramadol and Elavil and suggested he schedule a physical therapy appointment. Id.

Jacobs treated with Thea R. Shaw, a doctor of physical therapy, on October 20, 2010. (R. 410-12). He reported pain levels of three in his lower back, two in his left knee and five in his right knee. (R. 411). He tested negatively bilaterally on the SLR and FABER tests, as well as negatively on the right side and positively on the left side for the slump test. Id. Dr. Shaw found that Jacob's chronic low back pain occasionally limited his mobility. (R. 412).

Jacobs next visited Dr. Deaton on April 4, 2011 for a review of his hypertension, hyperlipidemia, and arthralgia. (R. 396). His blood pressure was 117/81 and he reported a pain level three but noted it was relieved by Tramadol. (R. 396, 402). His knees were tender but without swelling or deformity. (R. 397). He tested negative on a post-traumatic stress disorder screening. (R. 403). Dr. Deaton concluded his hypertension and hyperlipidemia were controlled and that his chronic bilateral knee arthralgia persisted. (R. 397).

On the same day, Dr. Deaton completed his own Physical Residual Functional Capacity Evaluation. (R. 379-83). He cited Jacobs' impairment as degenerative joint disease in both knees with continual pain which had lasted or could be expected to last at least twelve months. (R. 379). He noted Jacobs had pain in both knees when standing and after fifteen minutes of sitting. (R. 379). This required that Jacobs not walk, nor stand for more than fifteen minutes or sit for more than thirty minutes at a time. (R. 380-81). Dr. Deaton noted that anti-inflammatory drugs

had not helped and the pain level had remained constant since October 2010. (R. 379). He further found Jacobs could lift ten pounds and perform some postural activities occasionally but never twist, stoop, crouch, or climb ladders or stairs. (R. 381-82). He opined that Jacobs' pain would result in "all bad days," frequent interruptions, and an inability to work at all on some days. (R. 382-83). He stated that Jacobs' pain constantly interferes with the attention and concentration needed to perform even simple work tasks, and as a result he is incapable of performing even "low stress" jobs. (R. 380). Dr. Deaton did note, however, that Jacobs' complaints of pain were not the result of an objective physical condition. (R. 383).

At the hearing, Jacobs testified that he left his employment in December 2006, because it required too much standing and he was taking too much Motrin. (R. 55). He stated that as a result of pain in his knees and lower back he cannot walk and must adjust or sit down after standing fifteen minutes. (R. 45-46). He estimated that he can lift or carry about five to ten pounds. (R. 46). He further testified that he spends most of his day sitting on the couch and drives whenever he must leave his home. (R. 48-49, 51).

The ALJ also heard from Edith Edwards, a vocational expert ("VE"). The VE described Jacobs' prior employment as a booking agent and financial branch manager as sedentary, skilled positions. (R. 54-55). The VE testified, in response to hypothetical limitations framed by the ALJ, that Jacobs could perform both prior occupations (R. 56), as well as the jobs of information clerk, office clerk and surveillance system monitor. (R. 57-58). In response to questions framed by Jacobs' counsel, the VE also stated that these jobs do not allow for unscheduled breaks or more than two absences per month. (R. 59).

## III. STANDARD OF REVIEW

In reviewing a decision of the Commissioner denying benefits, the Court is limited to determining whether the decision was supported by substantial evidence on the record and whether the proper legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g); Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance. Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

The Court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); Hays, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decisions falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." Craig, 76 F.3d at 589. The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed. Perales, 402 U.S. at 390. Thus, reversing the denial of benefits is appropriate only if either the ALJ's determination is not supported by substantial evidence on the record, or the ALJ made an error of law. Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## IV. ANALYSIS

To qualify for disability insurance benefits under sections 416(i) and 423 of the Social Security Act, 42 U.S.C. §§ 416(i) and 423, an individual must meet the insured status

requirements of these sections, be under age sixty-five, file an application for disability insurance benefits and a period of disability, and be under a "disability" as defined in the Act.

The Social Security Regulations define "disability" as the:

> inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

20 C.F.R. § 404.1505(a); see also 42 U.S.C. §§ 423(d)(1)(A) and 416(i)(1)(A). To meet this definition, a claimant must have a "severe impairment" which makes it impossible to do previous work or any other substantial gainful activity that exists in the national economy. 20 C.F.R. § 404.1505(a); see 42 U.S.C. § 423(d)(2)(A).

The regulations promulgated by the Social Security Administration provide that all material facts will be considered in determining whether a claimant has a disability. The Commissioner follows a five-step sequential analysis to ascertain whether the claimant is disabled. The five questions which the ALJ must answer are:

1. Is the individual involved in substantial gainful activity?

2. Does the individual suffer from a severe impairment or combination of impairments which significantly limit his or her physical or mental ability to do work activities?

3. Does the individual suffer from an impairment or impairments which meet or equal those listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1 (a "listed impairment" or "Appendix 1")?

4. Does the individual's impairment or impairments prevent him or her from performing his or her past relevant work?

5. Does the individual's impairment or impairments prevent him or her from doing any other work?

An affirmative answer to question one, or a negative answer to question two or four,

results in a determination of no disability. An affirmative answer to question three or five establishes disability. This analysis is set forth in 20 C.F.R. §§ 404.1520 and 416.920. The burden of proof and production rests on the claimant during the first four steps, but shifts to the Commissioner on the fifth step. Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995) (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992)).

When conducting this five-step analysis, the ALJ must consider: (1) the objective medical facts; (2) the diagnoses, and expert medical opinions of the treating and examining physicians; (3) the subjective evidence of pain and disability; and (4) the claimant's educational background, work history, and present age. Hays v. Gardner, 376 F.2d 517, 520 (4th Cir. 1967) (citing Underwood v. Ribicoff, 298 F.2d 850, 851 (4th Cir. 1962)). At all steps the ALJ bears the ultimate responsibility for weighing the evidence. Hays, 907 F.2d at 1456.

**A. The ALJ's Decision**

In this case, the ALJ made the following findings under the five part analysis: (1) the ALJ found that Jacobs had not engaged in substantial gainful activity since December 27, 2006 (the alleged onset date); (2) Jacobs had severe impairments of osteoarthritis of the knees and obesity; (3) his combination of impairments did not meet one of the listed impairments in Appendix 1; and (4) Jacobs had the RFC to perform light work with additional limitations, and as a result could perform his past relevant work as a financial branch manager. (R. 16-22).[3]

In his motion for summary judgment, Jacobs argues five errors by the ALJ which require either reversal or remand. All of the alleged errors relate to the ALJ's finding concerning Jacobs' RFC and his related ability to perform past work. He first claims the ALJ failed to properly

---

[3] The ALJ did not proceed to Step Five, because he had already determined that Jacobs was not disabled at Step Four.

weigh the VA's determination that he is 60% disabled or explicitly detail the reasons for according it little weight. This report concludes that a post-hearing change in Fourth Circuit precedent mandates remand for the ALJ to perform a more detailed analysis of Jacobs' VA disability rating. Because this analysis necessarily affects the ALJ's other findings concerning Jacobs' RFC and ability to work, the undersigned makes no finding or recommendation concerning the ALJ's original conclusions on those issues.

**B. The Commissioner's final decision did not adequately evaluate evidence of the VA's prior finding that Jacobs was disabled in light of new Fourth Circuit precedent requiring that the VA's finding be given "substantial weight."**

At the time of the hearing before the ALJ, the VA had found Jacobs disabled and unemployable. However, at the hearing the ALJ received scant evidence to establish a basis for the VA's determination. Jacobs submitted a two-page letter, along with a one page attachment, from the VA outlining his benefits and the related disabilities.[4] (R. 384-86). The attachment relates that Jacobs was found to have a 30% disability for each lower extremity due to the same condition, a 10% disability for migraine headaches, and a 10% disability for hypertensive vascular disease. (R. 386). Neither the letter nor the attachment included any discussion of the medical evidence supporting the VA's decision, or the rationale supporting either the percentage disability or the VA's overall rating of unemployability. Jacobs also did not offer any other evidence concerning the basis for the VA's determination when he testified before the ALJ.

In his opinion, the ALJ cited the VA's disability rating and noted that Jacobs had been

---

[4] The Compensation and Pension Examination referenced above does not evidence how the VA determined that Jacobs was disabled. Rather, the purpose of that exam was to determine the extent to which Jacobs' impairments were service-connected. It did not outline the VA's reasoning supporting its determination that Jacobs was disabled or provide medical analysis supporting that decision.

found 60% disabled and compensated at 100% because the VA found him "unemployable, and totally and permanently disabled." (R. 18-19). However, the ALJ gave little weight to the VA's disability rating, noting that such determinations are not binding on the Social Security Administration. He further observed that disability determinations for Social Security benefits are reserved to the Commissioner and made according to Social Security law. (R. 19). The ALJ ultimately concluded that "[c]onsidering the totality of the record . . . the [ALJ] gives greater weight to the State agency assessments than to either Dr. Deaton's assessment or the VA determination." (R. 20).

At the time of the hearing and presently, Social Security regulations require the ALJ to consider decisions by other governmental agencies related to the claimant's disability. Although not binding, the regulations suggest that the ALJ should "explain the consideration given to these decisions in the notice of decision for hearing cases and in the case record for initial and reconsideration cases." Williams v. Astrue, No. 5:11cv286, 2012 WL 3240467, at *9 (E.D.N.C. Apr. 4, 2012) (unpublished) (quoting SSR 06-3P). In this case, the ALJ's brief explanation was commensurate with the evidence in the record before him concerning the VA's determination, and Fourth Circuit precedent at the time. See Williams, 2012 WL 3240467 at *9; Barnett v. Astrue, No. 3:10cv1316, 2012 WL 75046, at *16 (S.D. W. Va. Jan. 10, 2012) ("When comparing the standards for establishing disability promulgated by the SSA to the less exacting standards employed by the VA, the ALJ's decision to give 'little weight' to the VA's determination is entirely reasonable.").

After the hearing and the Appeals Council's denial of review, however, the Fourth Circuit decided Bird v. Commissioner of Social Security, 699 F.3d 337 (4th Cir. 2012). The new

opinion held that the SSA must give "substantial weight" to a VA disability rating. Id. at 343. Like Williams, the Bird opinion acknowledged that the SSA and VA apply different standards, but also noted that both "serve the same governmental purpose of providing benefits to persons unable to work because of a serious disability," and both require extensive medical documentation. Id. As a result, a disability rating by one of the two agencies is "highly relevant to the disability determination of the other." Id. The opinion also recognized, however, that the "SSA employs its own standards for evaluating a claimant's alleged disability, and [] the effective date of coverage . . . under the two programs will likely vary." Id. As a result, even under the new rule announced in Bird, the Commissioner may give less weight to a VA rating "when the record before the ALJ clearly demonstrates that such a deviation is appropriate." Id.

Unsurprisingly, Jacob's Motion for Summary Judgment argues that the ALJ erred by not according "substantial weight" to the VA's disability determination. (ECF No. 10 at 12-13). As a result, he argues that Bird requires either reversal or remand. Id. If remanded, he asserts that the ALJ must either give substantial weight to the VA's disability determination or explicitly detail the reasons for according it less weight. (ECF No. 13 at 4-5). The Commissioner contends that the ALJ already afforded careful consideration to the VA's disability rating and clearly demonstrated the reasons for giving it little weight. (ECF No. 12 at 15). For support he relies on four paragraphs in the ALJ's opinion which analyze the medical records underlying Jacobs' VA rating, and the ALJ's concluding statement that after considering the whole record he was assigning more weight to the State agency physicians' opinions than to Dr. Deaton's or the VA's determination. Id. at 15-16.

It is true that the ALJ carefully evaluated all of the medical evidence and considered the

16

VA's rating to the extent the evidence presented it. However, his analysis was based on the law as it existed before the Fourth Circuit addressed "the precise weight that the SSA must afford to a VA disability rating." Bird, 699 F.3d at 343. After carefully reviewing the ALJ's analysis and the record, the undersigned is unable to conclude that the ALJ's analysis after Bird is supported by substantial evidence, or that the ALJ would have reached the same conclusion in light of the new standard. While the ALJ referenced the VA's determination, he did not discuss it in detail and there is scant evidence in the record indicating the VA's basis for its determination that Jacobs is disabled. Without more, the undersigned cannot determine that the ALJ intended to deviate from the Fourth Circuit's new presumption.

It is not clear that the ALJ's four-paragraph analysis of Jacobs' medical records was intended to clearly demonstrate the reasons for according the VA's determination little weight rather than substantial weight. This is because prior to Bird the law did not require any specific weight be assigned to the VA's finding. Bird, 699 F.3d at 343 ("We have not previously addressed the precise weight that the SSA must afford to a VA disability rating."). Rather, the ALJ appeared to give "little weight to [the VA's determination] for purposes of [Jacobs'] Social Security claim," because he was not bound by the VA's determination. (R. 19). The Fourth Circuit has now, however, made it clear that the ALJ must give the VA's disability determination "substantial weight" or explicitly detail the reasons for giving it less weight. See Bird, 699 F.3d at 343. Because the ALJ did not know to conduct this analysis, and did not in fact conduct it, the undersigned is unable to determine whether substantial evidence supports the ALJ's denial of benefits. Therefore, remand is necessary in order to allow the ALJ to weigh the evidence of Jacobs' VA rating in accordance with Bird.

This is not to suggest that the ALJ's conclusions on RFC could not be sustained under the new standard. The Fourth Circuit specifically identified the fact that "the SSA employs its own standards for evaluating a claimant's alleged disability" as one ground which may justify deviation from substantial weight. Here however, the ALJ performed the analysis from a different starting point, and as a result remand is the appropriate remedy.

## V. RECOMMENDATION

For the foregoing reasons, the undersigned recommends that the Court DENY the Commissioner's Motion for Summary Judgment (ECF No. 11), GRANT the Plaintiff's Motion for Summary Judgment (ECF No. 9), and vacate the prior decision and remand the case for further consideration in light of the changes in law concerning Jacob's disability rating, and its impact on this claim for benefits.

## VI. REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. ' 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this Report to the objecting party, 28 U.S.C. ' 636(b)(1)(C), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. A party may respond to another party=s objections within fourteen (14) days after being served with a copy thereof.

2. A district judge shall make a <u>de novo</u> determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this Court based on such findings and recommendations. <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Carr v. Hutto</u>, 737 F.2d 433 (4th Cir. 1984); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984).

/s/
Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
July 15, 2013

## Clerk's Mailing Certificate

A copy of the foregoing Report and Recommendation was mailed this date to each of the following:

John Harlow Klein
Montagna Klein Camden LLP
425 Monticello Ave.
Norfolk, VA 23510

Mark Anthony Exley
United States Attorney Office
101 W Main St
Suite 8000
Norfolk, VA 23510

Fernando Galindo, Clerk

By _____
Deputy Clerk

JUL 2 6 2013